UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 21-cr-487 (CKK) |
| | : | |
| v. | : | |
| | : | |
| NICHOLAS L. KENNEDY, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S POST-TRIAL BRIEF REGARDING COUNT TWO**

In response to the Court's request during the October 23, 2024 trial, the United States hereby submits this brief outlining the defendant's guilt under Count Two, charging him with a violation of 18 U.S.C. § 1512(c)(2), under the standard established in *Fischer v. United States,* 603 U.S. ---, 144 S. Ct. 2176 (2024). The Court's Minute Entry from the next day directs the government to file "proposed findings of fact and conclusions of law." Oct. 24, 2024 Minute Entry.

As described herein, the evidence at the stipulated trial proves, beyond a reasonable doubt, that the defendant impaired the availability of records, documents, objects, or other things to be used in an official proceeding. That is, through his corrupt actions on January 6—including entering the Capitol at 2:14 p.m. and participating in the mob's efforts to violently enter the House Chamber—defendant intended to and did impair the availability of necessary records, documents, objects, and other things (*e.g.*, the states' Electoral College Certificates) from their presence at the official proceeding. Furthermore, the evidence also proves that the defendant attempted to make unavailable or impair the integrity of records, documents, objects, or other things to be used in an official proceeding. That is, had the defendant and the mob succeeded in making contact with records, documents, objects, and other things necessary to the Certification, the defendant would have impaired their integrity. And, to the extent that defendant was laboring under a misunderstanding as to which records, documents, objects, and other things were present at the

1

Capitol or where they were, he nonetheless intended to seek them out and impair their availability or integrity.

The evidence supports a verdict of guilty on Count Two.

I. <u>**LEGAL PRINCIPLES**</u>

### A. The *Fischer* Decision

In *Fischer,* the Supreme Court announced that, "to prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or attempted to do so." *Fischer,* 144 S. Ct. 2176, 2191. To reach this holding, the Court reasoned that the "otherwise" provision in 1512(c)(2) was limited by the preceding list of criminal violations set forth in 1512(c)(1), *i.e.*, someone who "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." The Court found that all of these were simply "specific examples of prohibited actions undertaken with the intent to impair an object's integrity or availability for use in an official proceeding." *Id.* Accordingly, § 1512(c)(2) "makes it a crime to impair the availability or integrity of records, documents, or objects used in an official proceeding in ways other than those specified in (c)(1)" and to "impai[r] the availability or integrity of other things used in an official proceeding beyond the 'record[s], document[s], or other object[s]' enumerated in (c)(1)." *Id.* at 2194 (Jackson, J., concurring) (internal citations omitted).

### B. Legal Elements to Prove a Violation of 18 U.S.C. § 1512(c)(2)

Following *Fischer*, to prove a violation of 18 U.S.C. § 1512(c)(2), the parties agree that the government must prove:

- *First*, the defendant committed or attempted to commit an act that impaired the

2

> integrity of or rendered unavailable records, documents, or other things to be used in an official proceeding;[1]

- *Second*, the defendant intended to impair the integrity of or render unavailable such records, documents, objects, or other things to be used in an official proceeding; and

- Third, the defendant acted corruptly.

The parties agreed on other relevant legal instructions, such as the elements of aiding and abetting and attempt. See ECF 82.

*Fischer* did not address the meaning of "corruptly," and this Court previously found that the evidence established beyond a reasonable doubt that the defendant acted corruptly. Accordingly, the government's submission focuses primarily on the first two elements.

## II. OVERVIEW OF THE FACTUAL RECORD

The parties executed a 24-page Joint Statement of Elements and Facts for Stipulated Trial as to Count Two and Guilty Plea as to Counts One and Seven (hereinafter, the "SOF"). Attachment A (SOF). The SOF references and incorporates a series of exhibits, which exhibits were presented during the stipulated trial in this case and form part of the factual record. *See* Attachment B (Exhibit List). The SOF and supporting exhibits establish, beyond a reasonable doubt, that each of the elements has been met. Before delving into argument, the government briefly sets forth an overview of facts that have been established by the trial record.

---

[1] The defendant suggested that the first element must reference "evidence impairment," but, during the stipulated trial, conceded that the above formulation of the *elements* was correct, and that arguments that a particular item did not qualify as "records, documents, or other things" went to the *sufficiency* of the evidence, not the correct legal standard. Oct. 23, 2024 Trial Tr. 84:4 – 84:20.

3

### A. The Certification of the Electoral College Involved Records, Documents, Objects, and Other Things.

The "official proceeding" (*i.e.*, the Certification of the Electoral College vote) on January 6, 2021 "plainly used certain records, documents, or objects—including, among others, those relating to the electoral votes themselves." *Fischer,* 144 S. Ct. at 2194 (Jackson, J., concurring). The SOF sets forth the process under the United States Constitution and federal statutes by which the states meet to certify the results of the election. SOF ¶¶ 2-3. The electoral certificates from each state are sent "from the states to the president of the Senate in paper form." *Id.* at ¶ 4. "Before the Certification of the Electoral College vote, the envelopes containing the certificates are placed into ballot boxes." *Id.* The Twelfth Amendment requires that the Vice President "shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." *Id.*

On January 6, 2021, "congressional staff carried the ballot boxes containing the Electoral College certificates of vote into the House Chamber." *Id.* at ¶ 7. "Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection, and the ballot boxes were carried back to the Senate Chamber." *Id.*

In addition to the certificates, the Certification of the Electoral College involved other necessary records that were required to be present. Specifically, the House Journal is a large, heavy book in which the official record of proceedings of the House of Representatives. *Id.* at ¶ 12. The House Journal is a necessary record for the House to record its proceedings. *Id.* The House Journal was present in the House Chamber on January 6. *Id.*

### B. The Records, Documents, Objects, and Other Things Were Rendered Unavailable As a Result of the Defendant's Actions.

At approximately 12:53 p.m., the defendant was among the first wave of rioters to advance unlawfully onto Capitol grounds after watching a line of law enforcement at the Capitol get

4

overrun by the mob. *Id.* at ¶ 46. For more than one hour, the defendant remained on Capitol grounds as part of a violent mob as law enforcement tried unsuccessfully to control the crowd and expel it from the restricted area by, among other things, giving verbal orders to disperse, forming police lines, and deploying crowd-control measures, including less-lethal munitions. *Id.* at ¶ 49. The defendant continued his advance toward the building as rioters overwhelmed the police at each successive police line. *Id.* at ¶¶ 50-53.

At approximately 2:11 p.m., rioters approached the façade of the building. *See* GX 300; SOF ¶ 9. At approximately 2:13 p.m., the windows to the left and right of the Senate Wing Door were shattered and rioters began to enter the building. *Id.* at ¶ 54; GX 300. Kennedy entered the Capitol through the Senate Wing Door at approximately 2:14 p.m., less than 30 seconds after the Senate Wing Door had been kicked open by other rioters. *Id.* at ¶ 55.

As a result of the defendant and other rioters' entry into the building, members of the United States House of Representatives and United States Senate and Vice President Pence evacuated the chambers. *Id.* at ¶ 11. As they evacuated, members of the Senate staff had to remove the certificates of vote from the Senate Chamber. *Id.* at ¶ 12. A member of the House of Representatives staff packed the House Journal into an evacuation backpack and removed it from the Chamber. *Id.*

The certification proceedings in the Senate and House were put into recess. *Id.* at ¶ 54. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol. *Id.* at ¶ 13.

    **C. The Defendant Intended To and Did Obstruct the Electoral College Proceeding.**

As this Court has previously found in adjudicating the defendant guilty of 1512(c)(2) at the first stipulated trial on April 3, 2024, the defendant acted on January 6 with the intent to obstruct the

5

Certification of the Electoral College from proceeding. The defendant "understood that his actions and his presence [at the House Chamber door] were interfering with the ability of Congress to continue its proceedings to certify the election. Kennedy chose to remain." *Id.* at ¶ 69. The defendant also explicitly acknowledged that he "breach[ed] the restricted perimeter, participat[ed] in a stand-off with officers on the West Plaza, climb[ed] the scaffolding-covered stairs, illegally enter[ed] the building, and participat[ed] in a confrontation with officers and overwhelming a police line to reach the door of the House of Representatives [] in order to try to stop Congress from certifying the Electoral College vote that day and to confer a benefit on his preferred candidate for president, Donald Trump." *Id.* at ¶ 73.

As described in more detail below, the defendant's knowledge of the certification process and intent to stop the process have been established through the defendant's communications prior to January 6 and through his actions on January 6.

### D. The Defendant Intended To and Did Impair the Availability of Records, Documents, Objects, and Other Things.

The fundamental issue before the Court in the October 23, 2024, bench trial of Nicholas Kennedy is the question of intent and whether it meets the requirement established in *Fischer*, *i.e.*, whether the evidence establishes that the defendant intended to impair the availability of necessary records, documents, objects, and other things from their presence at the official proceeding. The answer is yes. The defendant's knowledge of and intent to impair records, documents, objects, and other things is established by the SOF and supporting exhibits.

i. <u>Defendant's Communications</u>

In the period between the November 3, 2020 U.S. Presidential Election and January 6, 2021, Kennedy sent, received, or created over one hundred images that reflected his belief that the Presidential Election had been "stolen" and his knowledge about the Certification process,

6

including that Congress would be meeting at the Capitol on January 6 to conduct the Certification of the Electoral College vote. *See id.* at ¶ 19. The full context of the defendant's communications is not available because the defendant "wiped" his phone a "few times" after the riot at the Capitol. *Id.* at ¶ 80-81. The images that remained on the phone, which are described in the SOF, are no longer associated with the original text communication because the associated text communication had been deleted during the factory reset and only the image had been restored. *Id.*; *see also* Trial Tr. at 38:14-19 (Attorney Zimmerman explaining that the recovered images had been "sent to private individuals in text messages.").

    The remaining images still reveal defendant's knowledge, understanding, and intent. The defendant engaged in numerous communications regarding election fraud. These communications referenced multiple states and involved discussion of the manipulation of physical ballots. *See* GX 73-190 (photograph of ballots being sorted); GX 73-118 ("Ballots found in the trash"); GX 73-119 (describing a 9,626 vote error discovered during a "hand recount" and including a picture of physical counting); GX 73-242 (referencing alleged fraud with "mail-in ballots"). One message in particular showed a Tweet from Donald J. Trump in which former President Trump stated, "It's all about the signatures on the envelopes . . . We will find massive numbers of fraudulent ballots. The signatures won't match. Fight hard Republicans. Don't let them destroy the evidence." GX 73-213. The defendant's communications also include celebratory descriptions related to actions taken to "seize" physical objects related to the vote count. One such message states that the "U.S. Army has seized servers" used in the election. GX 73-194; *see also* GX 160 ("The raw data in the server seized by the US military…revealed that Trump actually won 410 electoral college votes.").

    Multiple communications sent by the defendant include references to the role of Congress in certifying the election. For example, on December 2, 2020, Kennedy shared an image of a social

7

media post by Representative Matt Gaetz that read, in part, "There's an interest in examining voting irregularities and forcing a debate in Congress about whether or not to accept states' electors where those irregularities exist." SOF ¶ 26; GX 73-220. The defendant's communications include specific references to the "Electoral College Certification Process on Jan. 6" and Congress's role in it. GX 73-35 (Senator Hawley Tweet stating, in part, "I cannot vote to certify the electoral college results on January 6 without raising the fact that some states, particularly Pennsylvania, failed to follow their own state election laws . . . Congress should investigate allegations of voter fraud and adopt measures to secure the integrity of our elections….For these reasons, I will [ ] object during the certification process on January 6 to raise these critical issues."). The defendant's communications also included specific references to former Vice President Pence's role in accepting or rejecting electoral college votes. GX 73-188 ("Pence didn't have to request the States for clean slate of electors because those state legislatures and Voter Integrity Alliances are suing HIM and all of congress for accepting illegal non certified electors by their state legislature per the constitution! Forcing Pence to NOT count them!! Filed in District of Columbia Court last night! Thats it! He won't be able to count all those electoral college votes in PA, MI, GA, WI and AZ for Biden!").

    Critically, following months of communications that discussed fraud involving physical and electronic manipulation of ballots, the defendant understood that "evidence" of the fraud would be presented on January 6. Indeed, on January 4, 2021, Kennedy shared an image with a link to an article that purported to include a statement from former President Trump that "'Massive Amounts of Evidence [Would] Be Presented' on Jan. 6." GX 73-268; SOF ¶ 36.[2]

---

[2] Defense counsel argued that there was "nothing to suggest that he knew exactly what [the electoral college votes] looked like" or that he "knew where they were at." Trial Tr. 106:7-11.

ii. Defendant's Actions

Prior to January 6, the defendant sent communications that promoted the rally in Washington, D.C. on January 6. Those communications encouraged attendees to convene at the Ellipse at 9 a.m. (SOF ¶ 35; GX 73-219) and on the National Mall at noon (SOF ¶ 32; GX-73-232). After traveling to Washington, D.C. from Missouri, the defendant ignored the advertised rallies. Rather, after assembling near the Washington Monument, the defendant marched with more than 100 other men to the Capitol at approximately 10:30 a.m. SOF ¶ 39-40. After stalking the outer boundaries of the Capitol, the defendant eventually marched to a thinly guarded pedestrian entrance near Peace Circle at 12:50 p.m.—just ten minutes before the start of the Certification. *Id.* at ¶¶ 41-44. Within minutes, Kennedy joined the crowd as it surged past law enforcement. *Id.* at ¶¶ 45-47.

For more than one hour, the defendant remained on Capitol grounds as part of a violent mob as law enforcement tried unsuccessfully to control the crowd and expel it from the restricted area. *Id.* at ¶ 49. Rioters overwhelmed the police at each successive police line. *Id.* at ¶¶ 50-53. After rioters breached the final police line on a set of concrete stairs, the defendant and the mob advanced to the façade of the building. *See* GX 300; SOF ¶ 9. At approximately 2:13 p.m., the defendant entered the Capitol through the Senate Wing Door. SOF ¶ 55. The defendant remained in the Capitol building for nearly an hour.

The defendant first traveled to the Senate side of the building, but he and other rioters were stopped by a police line who held the group in place. SOF ¶¶ 56-58. The defendant attempted to push through the police line, but he was unable to advance. *Id.* at ¶¶ 58-59. The crowd and the

---

Whether he knew precisely what they looked like or where they were, the SOF establishes the defendant's knowledge of the involvement of election-related records at the Capitol on January 6.

9

defendant eventually broke through the police line, and the defendant returned to the area near the Senate Wing Door (*i.e.*, the location where he had entered). *Id.* But the defendant did not exit the building. *Id.* at ¶ 61. Rather, the defendant traversed the entire Capitol building from north to south, and the defendant arrived in an area just outside the House Chamber. *Id.* at ¶ 62-63.

As the defendant and other encountered another police line outside the House Chamber, rioters around the defendant began to chant and yell. One rioter suggested that the crowd, "Drag 'em out!" and another yelled out, "tell Pelosi we're coming for [her]." SOF ¶ 63. At approximately 2:36 p.m., within ten minutes of arriving and entering into a standoff with officers, the crowd surged forward and overwhelmed the line of officers. *Id.* at ¶ 64; GX 500 at 1:03:20; GX 308 at 1:08. The crowd moved into the vestibule just outside the Main House Doors. *Id.* at ¶ 64. Two officers were pinned against the door. *Id.* The defendant moved to the front of the crowd and stood within feet of the Main House Doors. *Id.* The defendant turned back to the crowd and made a series of tactical hand signals. *Id.*; GX 500 at 1:04:05 – 1:04:25. The defendant eventually saw rioters succeed in breaking the glass on the Chamber door. *Id.* The defendant could see officers on the other side of the door with their weapons drawn. *Id.* at ¶ 68. The defendant spent approximately seven minutes at the House Chamber door. *Id.* at ¶ 69.

The defendant understood that his actions and his presence at the House Chamber door were interfering with the ability of Congress to continue its proceedings to certify the election. *Id.* Indeed, the defendant later acknowledged that once he learned that the House Chamber had been evacuated, he left the Capitol because "there[ was] no sense of being in [t]here." SOF ¶ 71; GX 41 at 29:24 – 30:2.

### III. ARGUMENT

#### A. The Defendant Committed or Attempted to Commit an Act that Impaired the Availability and Integrity of Documents, Records, Object, and Other Things.

As the government previewed at the Stipulated Trial on October 23, 2024, the defendant can be found guilty of 18 U.S.C. § 1512(c)(2) under any one of several interrelated legal theories.

First, the defendant's action in being among the first to enter the Capitol at 2:14 p.m. and penetrating deeply into the building *directly caused* documents, records, objects, and other things (e.g., the electoral ballots) to become unavailable. That is, the certification proceeding involved the counting of the electoral ballots—physical certificates reflecting the electoral college votes—as set forth in the Constitution and by statute. The electoral ballots were present at the Capitol and a necessary part of the proceeding. *See* Part II.A, *supra*. The defendant was part of the initial group that breached the Capitol Building, entering it through the Senate Wing Door at 2:14, less than 30 seconds after it had been first kicked open. SOF ¶ 56. Senate staff had to evacuate, and they had to remove the electoral certificates with them from the Senate Chamber as they evacuated. *Id.* at ¶ 12. Thus, the defendant, by breaching the Capitol Building as part of the first wave of rioters, caused the removal of electoral ballots from the Senate Chamber, rendering them unavailable for hours.

Second, the defendant's conduct satisfies the elements of 1512(c)(2) in showing that the defendant *attempted to impair the availability and integrity* of documents, records, objects, and other things (e.g., the electoral ballots). As set forth at Part II.D.ii, *supra*, the defendant advanced to the door of the House Chamber as part of a violent mob whose members chanted "break it down!" and "use your kevlar!," smashed glass, used flagpoles and canes to try to beat against the door, and forced officers to barricade the door with furniture and draw their guns as a member of Congress pleaded with the mob to stand down. SOF ¶¶ 64-69. The defendant's attempt to break

into the House Chamber as part of the mob was an attempt to impair the availability and integrity of the electoral ballots and other documents used in the proceeding.³ The violent nature of the mob's conduct demonstrates that, had it succeeded in breaching the chamber and getting their hands on the electoral votes for President Biden, the defendant and others would not have left them untouched and available for Congress's consideration, particularly in light of the defendant's knowledge, appreciation, and intent of what was being considered and evaluated during the proceeding itself. In addition to impairment of the legitimate electoral college ballots, the defendant also attempted to impair the integrity and availability of the "evidence" that supported the legitimate electoral college votes (such as purportedly fraudulent ballots) that he believed would be presented at the certification on January 6. *See* discussion at Part II.D.i, *supra*; *see also* SOF ¶ 36 (citing GX 73-268, image of article with headline "Massive Amounts of Evidence Will be Presented on Jan. 6: Trump"). The defendant's actions also demonstrate an attempt to obstruct by inducing Congress to substitute the fake, pro-Trump electoral votes (as a post he shared referred to them as, a "clean slate" of electors) in place of the ballots reflecting President Biden's victories in several states. An attempt to introduce false evidence into a proceeding also violates Section 1512(c)(2) after *Fischer. See* 144 S. Ct. at 2186 (citing *United States v. Reich*, 479 F.3d 179, 185–187 (CA2 2007) (Sotomayor, J.) (prosecution under subsection (c)(2) for transmitting a forged court order).⁴

---

³ The fact that the electoral ballots had actually been moved from the House to the Senate is of no moment under an attempt theory of liability.

⁴ As set forth in the SOF, the defendant took substantial steps in furtherance of these goals, breaching the restricted area, invading the Capitol, breaking through two police lines, and ultimately menacing the House Chamber. This went far beyond simply sharing images about election fraud via text message. The defendant's steps—steps involving independently illegal conduct—were an effort to force Congress to credit challenges to the electoral votes' integrity—prompted by hundreds of invaders in the Chamber where the proceedings were to take place.

**B. The Defendant Acted With an Intent to Impair the Availability and Integrity of Documents, Records, Objects, and Other Things.**

The central issue to be decided at by the Court in this trial is whether the defendant had the requisite intent to violate 18 U.S.C. § 1512(c)(2). Here, after drawing reasonable inferences from the evidence submitted in the stipulated trial, the government has met its burden. That is, the evidence in this case establishes beyond a reasonable doubt that defendant intended to impair the availability and integrity of the electoral votes, and that he intended to impair the availability and integrity of the "evidence" underpinning the electoral votes that he expected would be presented during the certification. The defendant followed the election closely, purported to believe that it had been stolen from former President Trump, and understood that significance of the electoral vote count set for January 6. Despite his attempts to remove evidence of his crime from his phone, the FBI recovered over 100 images from the defendant's phone that tell the story of his intent to stop the proceeding on January 6 by any means necessary, including by impairing the availability and integrity of documents, records, and other things that the defendant believed would be present at the Capitol on January 6.

The law draws no distinction between direct and circumstantial evidence, and a jury is given wide latitude to draw justifiable inferences of fact. *See United States v. Torres*, 894 F.3d 305, 311 (D.C. Cir. 2018) (citing *United States v. Vega,* 826 F.3d 514, 522 (D.C. Cir. 2016)). "Because direct evidence of mental state (such as a defendant's admission as to what he was thinking) is rare, juries routinely determine intent from indirect, or 'circumstantial,' evidence." *Id.* (citing *Vega*, 826 F.3d at 523). "Such indirect evidence might include a defendant's conduct before, during, or after the charged criminal acts, or the facts and circumstances known to him when he acted." *Id.* (citing *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008)).

Here, the defendant's communications, which are summarized at Part II.D.i, *supra*, establish that the defendant acted on January 6 with the intent to stop the certification through acts that included the targeting of documents, records, and other things necessary to the Electoral College Certification. For example, on December 30, 2020, the defendant shared an image of a social media post by Senator Josh Hawley of Missouri, which stated, in part, that he would "Object[] During Electoral College Certification Process on Jan. 6." SOF ¶ 33 (citing GX 73-35). Senator Hawley's post stated further, in part, "I cannot vote to certify the electoral college results on January 6 without raising the fact that some states, particularly Pennsylvania, failed to follow their own state election laws . . . Congress should investigate allegations of voter fraud and adopt measures to secure the integrity of our elections." *Id.* Just days later, on January 4, 2021, the defendant shared an article claiming that former President Trump had claimed "evidence" would be presented on January 6 regarding these types of supposed voting irregularities. SOF ¶ 36 (citing GX 73-268, image of article with headline "Massive Amounts of Evidence Will be Presented on Jan. 6: Trump"). These messages were preceded by the sharing of an image on December 24, 2020, that discussed the role of former Vice President Pence in accepting or rejecting the "illegal non-certified electors" and potentially accepting a "clean slate of electors." SOF ¶ 30 (citing GX 73-188). The defendant thus understood that Congress Vice President Pence's task was to count the ballots on January 6. If Congress or Vice President Pence would not stop the count to investigate and invalidate the ballots based on claims of voter fraud, the defendant determined to take action on January 6 to bring about that same result.

Defendant's communications reflect the defendant's belief that the electoral ballots and other evidence would be central to the certification proceeding on January 6—a proceeding that the defendant has already been proven beyond a reasonable doubt to have intended to stop. *See*

Part II.C, *supra*. It must also be noted that the communications referenced above are communications shared by the defendant. In other words, these communications are not simply items that he read or received, but items that he read or received and then chose to communicate to others. This level of engagement with the content further underscores the defendant's understanding, focus, and intent as he approached January 6.

On January 6, the defendant acted on his intent to disrupt the Certification by impairing the availability or integrity of documents. The defendant marched straight to the Capitol, led the breach of the building, and advanced all the way to the door of the House Chamber, where the certification would have been taking place. "[T]he law permits the factfinder to infer that a person intends the natural and probable consequences of their actions." *Rivera,* 607 F. Supp. 3d at 9 (citing *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010)). The natural and probable—and actual—consequence of joining a mob invasion of the Capitol, and then overrunning a police line and continuing with that mob all the way to the door of the House Chamber, was that important items, such as the electoral ballots, would have to be removed from the Chamber. They could not be abandoned to the mob. If any question lingered in the defendant's mind about what the natural and probable consequences of his actions were, they were resolved by the time he joined the attack on the House Chamber and saw officers at the door with their guns drawn, positioned behind makeshift barricades at the door. The seven minutes that the defendant spent within feet of the House Chamber made crystal clear to the defendant how serious the mob's attack was and how there was no way Congress could proceed with business as usual under the circumstances. Indeed, the natural and probable consequence—and intended—consequence of the defendant's attempted action here—breaking into the House Chamber with a violent mob while members were inside—would also be to force a pause in the proceedings by, among other things, forcing all necessary

documents, records, objects, and other things out of the House Chamber where they were being considered by the Congress. For example, if Vice President Pence would not refuse to accept the "illegal non-certified electors," the defendant was prepared to and intended to carry out the refusal by making such records unavailable. And if the purportedly fraudulent "evidence" (e.g., the "fraudulent ballots" and "envelopes" referenced in GX 73-213) that supported those "illegal non-certified electors" was present, the defendant was prepared to take similar action. The Court can and should infer that the defendant intended these consequences or attempted to bring about these consequences, and accordingly find that he impaired the availability and integrity of documents, records, or other things involved in the January 6 certification proceeding, or attempted to do so.

Given the defendant's knowledge of the electoral process and the ballots and his targeted actions, his intent to stop the certification proceeding cannot be sealed off from his intent to affect the electoral votes that, as he knew, were the centerpiece of that proceeding. This is not a defendant who had a generalized understanding that Congress was doing "something" that day. He knew exactly what Congress was doing, and what he wanted to happen. It is not the case that the defendant wanted to bring Congress to a halt and yet was agnostic as to what should happen to the electoral votes for President Biden being considered. He wanted to block and delegitimize them too. *See United States v. Herrera*, 21-cr-619-BAH, ECF No. 65 (instructing the jury that a person may act with more than one intent); *United States v. Korte et al*, 22-cr-183-TSC, ECF No. 127 (same); *see also, e.g.,* Addendum to Statement of Offense, *United States v. Schaffer,* 21-cr-306 (APM), ECF No. 68-1 (January 6 defendant's admission that his efforts to stop the certification proceeding "targeted—and were intended to target—all aspects of the proceeding, including impairing the availability or integrity of the records, documents, objects, or other things used in

that proceeding. This includes, but is not limited to, the ballot certificates at issue in the proceeding.").

Also important is what the defendant did not do that day. He did not come armed. His altercation with the police near the Senate Carriage Door did not escalate. He did not, as others did, spend hours fighting with officers outside the Capitol. He did not leave through the Senate Wing Door when he had the chance. He did not stop at the Rotunda to photograph the domed ceiling or perhaps to chat. The defendant's actions reflect his focus—a focus on getting into the building; a focus on advancing to the House Chamber and contributing to the effort to break inside; a focus on impairing or making unavailable the people or the "fraudulent" certificates and ballots necessary to the proceeding. This defendant was focused on the proceeding—and on the integrity of the electoral votes that he knew were the central issue that day. His breach of the building, participation in subsequent breaches of police lines, and presence at the door to where the House should have been deliberating corroborates the intent expressed in the images recovered from his phone.

The Court can and should infer that Kennedy intended these consequences, and accordingly find that he impaired the availability and integrity of documents, records, or other things involved in the January 6 certification proceeding, or attempted to do so.

## CONCLUSION

The Court should find the defendant guilty of Count Two, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Jason McCullough
    JASON B.A. MCCCULLOUGH
    DC Bar No. 998006; NY Bar No. 4544953
    Assistant United States Attorney
    United States Attorney's Office
    601 D Street, N.W.
    Washington, D.C.  20530
    (202) 252-7233
    jason.mccullough2@usdoj.gov